NICHOLAS PATTERSON v. THE STEAMBOAT GULNARE.

(No. 10,676.)

1. Where legal proceedings are based on insufficient affidavits, the right to amend or file new affidavits will, ordinarily, depend upon whether any change of priorities may result.
2. No amendment will be permitted which will enable a creditor to gain an advantage in the race of diligence over another creditor.
3. The act of April 12, 1858, amending the watercraft law of 1840, confers a lien, at least of such a nature as that proceedings in foreign attachment against the owners, instituted after the liability occurred, but before seizure, do not divest it. The seizure, when made, is superior to the right acquired by the attachment.

Nicholas Patterson *v.* The Steamboat Gulnare.

SPECIAL TERM.—On motion by the plaintiff for leave to amend his bill of particulars and affidavit, and by the defendant to dismiss for insufficiency; and at the same time three other cases with this were submitted on motions to distribute the proceeds of sale of the Steamboat Gulnare.

On March 29, 1859, a warrant was issued in this case and executed by the seizure of the boat. The precipe, bill of particulars, and affidavit, state the cause of action as upon a promissory note, dated Cincinnati, January 1, A. D. 1859, for $375, signed " Steamboat Gulnare and owners, per Captain Samuel Minear," payable twenty days after date, to the order of Thomas Jones, and by him indorsed to the plaintiff. The declaration is in *assumpsit,* and contains the common counts for goods bargained and sold, work and labor, money lent, paid, had, and received, and due on account stated.

Subsequently, on May 19, the plaintiff had leave to amend his precipe, which he did by stating his demand to have accrued by assignment from Thomas Jones, whose claim was for wages as clerk, in the sum of $120, and the balance of $255 being for supplies, and by averring that the note was merely given as evidence of the claims.

*Thompson & Nesmith,* for plaintiff.

*Dodd & Huston,* for defendant Hazlett.

*D. K. Cady, Jr.,* for Isham & Fisher.

*Lincoln, Smith & Warnock,* for Linn's administrators.

HOADLY, J.  Wherever a priority is gained by a proceeding based on affidavits, and they prove defective, amendments have not been permitted by this court. Such is the case ordinarily in cases of attachment, and those arising under the watercraft law before its recent amendment. But where the proceeding is merely to enforce a lien already existing, no advantage is gained by the amendments, in the race of diligence among creditors, there seems to be no reason why

amendments should not on proper terms be permitted. This leads me to the consideration of the question presented by the motion for distribution, as to the effect of the act of April 12, 1858, amendatory of the watercraft law. For if that act gives a lien from the date of seizure only, under the rule as just stated, the desired amendment must be refused; but may be granted if a lien, from the time the wages were earned or the supplies furnished, is intended.

But I may add that, upon the plaintiff's own statement, the amendment can be of no benefit. He sued originally on a negotiable promissory note, in the name of the indorsee. But a watercraft can not be held upon negotiable paper, so that he is forced by amendment to resort to the original account, viz: wages and supplies. But here he is met with an equally fatal objection. He has sued in *assumpsit*, in the name of the assignee, upon a chose in action, which, by common law, is not assignable. I advise him to discontinue, and as his seizure detained the boat so that the other creditors have been able to secure themselves, the expense of the detention may be charged against the fund. If his claim dates since the act of April 12, 1858, he may, perhaps, still have a lien on the boat in the hands of the purchaser, and if the latter, as is said, is one of the former owners, he is not without a right to lay hold of her in a different way.

The next seizure was on April 6, on a writ of attachment in the case of the administrators of *J. C. Linn* v. *James McKinney and Wm. Mix*, for a much larger sum than the proceeds of sale amount to. On this writ seven-sixteenths of the boat were attached as the property of McKinney. I am satisfied from the testimony that McKinney owned but seven-thirty-seconds.

On the 7th of April warrants of seizure were issued and executed under the watercraft law, on claim for supplies, at the suit of John Hazlett, and of Isham & Fisher. These cases have passed into judgment, and the boat been sold under executions; $5.23 of Isham & Fisher's claim, and

$319.52 of Hazlett's, accrued after April 12, 1858, the residue before.

For some years after the watercraft law of 1840 was passed, there was much doubt as to its proper construction. The courts were at first inclined to treat it as a lien law, and it was decided, among other things, that a private sale did not cut off the right to seize for a prior debt, and that a mortgage must yield to a subsequent seizure. ·At length, and but recently, comparatively, it was settled that the statute gave no lien, but was only intended to provide a " cumulative remedy for the recovery of a claim against the owner." *Thompson* v. *Steamboat J. D. Morton,* 2 Ohio St. 29, and acting upon that view, this court, in *Barker, Hart & Co.* v. *Steamboat Flag,* 1 Handy, 385, decided that an attachment against the owners, executed by a seizure of the vessel, would take precedence of a subsequent seizure under the act upon a prior debt.

Shortly before the decision in 2 Ohio St., the admiralty jurisdiction of the federal courts had been extended, by congressional legislation, over the lakes, and judicial action soon planted it upon the great western rivers. Conflicts at once arose between admiralty liens and seizures under the watercraft law, and it was decided by the district court of the United States for the northern district of Ohio, Missouri, and perhaps Louisiana, that the Ohio watercraft law gave no lien till seizure, and hence, as against domestic vessels, there· being no law in admiralty. Ohio creditors were without a remedy out of the State, nor had they any here if the federal authorities effected the first seizure.

In enacting the act of April 12, 1858, the legislature must be taken to have intended to remedy this evil. Indeed, we know that this was the main object of the authors and friends of the law. And it is fair to suppose that they had in contemplation the consequence of the decision that the act of 1840 was only remedial, and designed to obviate them also. For if remedial, how could it be longer argued that a purchaser at private sale took subject to a claim under the

act, or that a prior mortgage must be postponed to a seizure. Those were the consequences of a lien. When A. ceased to have an interest in a vessel, it could not be fairly taken by legal process to pay his debts, except upon the theory of a lien.

The act of 1858 merely repeals section 1 of the act of 1840, and substitutes a new section. It provides that " steamboats and other watercrafts, navigating the waters within or bordering upon this State, shall be liable, and such liability shall be a lien thereon for debts contracted on account thereof by the master, owner, steward, consignee, or other agent for materials, supplies or labor in the building, repairing, furnishing, insuring or equipping the same," etc. * * * * * " *Provided,* that the lien by this section created shall only attach to vessels of twenty tons burthen and upward, enrolled and licensed for the coasting trade according to the act of Congress." Vol. 55, p. 72, O. L.

It is not the object of this act to make the boats quasi corporations, and capable to contract. The liability spoken of is not the personal liability we refer to when we say that A. is liable for a debt. It is a liability to seizure and sale, and this liability is made by the act a lien. This is in artificial language, but it clearly expresses the idea. The creditor is to have, not a lien in the strict sense of the word, but a lien such as admiralty gives, a privilege in the thing, a right upon or against it, to be asserted and enforced by seizure.

This lien is made effective by the seizure, but the law fixes it upon the vessel antecedently, and irrespective of any seizure, at least as against the owner. For it is the " liability" to seizure, not the seizure itself that gives the lien. And all mortgagees, purchasers, and attaching creditors who take only the owner's interest must take it subject to all existing " liabilities," which are liens.

I do not mean to say that as between lien-holders, the date of supplies furnished or wages earned, or damages sustained, fixes priority. It is enough for this case to hold that the lien created by this act adheres to the vessel from the

time the supplies were furnished; from the date of the "liability," *at least in such a sense* as that it can not be divested by any act of the owner, or any seizure of his interest in attachment.

I have been referred to the cases of *The Globe* and *The Triumph*, 2 Blatchford, 427, and 433, note, as showing that even in admiralty, there is no lien till seizure, and that the liens of material men must be paid in the order of seizure. Whatever may be said of those cases, as between lien holders, it is certain that the learned judges did not at all consider the effect of the admiralty lien as between the lienholder and the owner. It was far from their thoughts to decide that a private sale, or a foreign attachment against the owner would divest the lien given by admiralty. They have used language which may be pressed to that extent, but it was wholly with reference to the dates of conflicting admiralty liens of the same rank, and to proceedings *in rem*, which cut off all liens. No rule is better settled than that upon a private sale, the purchaser takes subject to all existing admiralty liens.

The fund in court will therefore be appropriated as follows: 1. To costs, including the costs of keeping and wharfage upon the writ issued by Patterson. 2. To the claims of Hazlett and Isham & Fisher for supplies furnished since April 12, 1858. 3. Seven-thirty-seconds of the residue, to the claim of the administrators of Joseph C. Linn. 4. The residue to be divided *pro rata* between the claims of Hazlett and Isham & Fisher, for supplies furnished before April 12, 1858.